IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| SHERRY CRAFT, Individually, and as Class Representative for all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NORTH SEATTLE COMMUNITY COLLEGE FOUNDATION, d/b/a AMERICAN FINANCIAL SOLUTIONS, and<br><br>AMERIX CORPORATION,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFS FOLLOWING HEARING ON CLASS CERTIFICATION**

In response to Supplemental Briefs filed by Amerix Corporation (Amerix) and North Seattle Community College Foundation d/b/a American Financial Solutions (AFS) stating their respective positions to the Court's question about the affect of the Maryland Arbitration class (Jones) certification, the Plaintiff states the following:

AFS and Plaintiff are essentially in agreement with one another as to their respective positions that the certified Jones arbitration class does not affect the putative Craft litigation class. In AFS's brief, it stated:

> [A]lthough the Arbitrator in the Jones Arbitration broadly-defined the certified class, which appears to include the purported plaintiff class defined in the Craft Litigation, the Class Determination Award of the Jones Arbitrator is less clear as to whether the Craft putative class would be included in that Class Wide Arbitration and thus neither supports nor precludes class certification in the present matter.

*Doc. 113, p. 2*.  See also *Doc. 108, p. 2* ("The Georgia putative class members are members of the National class defined in the Maryland Arbitration; however all of the members of the Maryland Arbitration class are not members of the Georgia putative class.").  Thus, AFS does not take issue with whether the Jones Arbitration class should prevent certification of the putative Craft Litigation class, but instead only reiterates its earlier arguments opposing class certification in this action without consideration of the Jones arbitration.

Further, AFS is also in agreement with the Plaintiff in this action that the Jones Arbitration and the Craft Litigation involve different causes of action and are not overlapping. As AFS stated in its supplemental brief,

> Though a class was certified in the Jones Arbitration, the elements and standards of liability of the claims in that arbitration are not identical to the [Georgia Debt Adjustment Act], thus, the [Jones] Class Determination Award does not provide guidance regarding the propriety of class certification in the Craft Litigation.

*Doc. 113 p. 3.*  As Plaintiff stated in her earlier supplemental brief,

> The Maryland class claimants also sought certification of a cause of action pursuant to the Maryland Debt Management Services Act (MDMSA) "and all other similar [state] statutes" apparently upon the basis that Genus[5] is (or was) headquartered in Maryland. *Doc. 100-4, ¶ 22.*  The Maryland Arbitrator summarily denied the Maryland claimants request for certification on this cause of action, and rightfully so.  See [*Doc. 108-2, p. 30*].  The overreaching attempt to dragnet in a national class with a wholly insufficient pleading that "all other similar statutes" to the MDMSA should be considered (without even an attempt to show the manageability of such an unruly claim or to define "similar") was unavailing to the Maryland arbitrator.  Id.  The overlap, if one existed, between this instant action and the Maryland arbitration *would* have been between the Maryland Arbitration certification of a national "MDMSA and other similar statutes" class (sought and denied in the Maryland Arbitration) and a pure Georgia Debt Adjustment Act class (sought here).  Thus, any overlap as to the

---

[5] Genus Credit Management was the predecessor in interest to AFS of Mrs. Craft's DMP contract.

> Plaintiff's cause of action against Defendants in this case and the MDMSA claims in Maryland Arbitration have been extinguished.

*Doc. 108, pp. 4-5.*

The only conceivable issue that *may* warrant consideration by this Court is the future possibility of a "double recovery" by Mrs. Craft and the putative class in the event that the class members' "debt adjustment fees" or "voluntary contributions" are returned to them pursuant to one of the causes of action remaining in the Jones arbitration.[6] It is not clear whether the potential damages in the Jones Arbitration would necessarily incorporate the monies paid by the certified Jones class members in Georgia or if the potential damages arise from other acts or omissions committed by the Jones defendants.

"[A] jury may award different measures of damages on multiple claims if the evidence establishes several distinct torts. [Cit.]" Alternative Health Care Systems v. McCown, 237 Ga.App. 355, 356 (1999). While Plaintiff agrees that it is the common law and public policy of Georgia that a litigant cannot recover more than once *for the same injury*,[7] the Jones arbitration and the Craft litigation allege separate and distinct injuries wholly unrelated to one another. In Jones, the alleged injuries arise from violations of: (1) the Credit Repair Organizations Act (CROA); (2) the Fair Debt Collection Practices Act (FDCPA); (3) RICO; and (4) the Maryland Consumer Protection Act (MCPA). A review of the four causes of action shows there is no overlap and no conflict between the Jones causes of action and the Craft causes of action.

CROA, 15 U.S.C. § 1679(b) states as its purposes are "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary

---

[6] It is important to note that no damages have been awarded in the Jones Arbitration, and thus any consideration of this issue at this point is merely speculation.

[7] Georgia Northeastern R. Co. v. Lusk, 277 Ga. 245 (2003).

to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." Thus, damages arising from a violation of CROA are separate and distinct from the damages arising from the Georgia Debt Adjustment Act.

FDCPA, 15 U.S.C. § 1692(e) states "It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." Again, as with CROA, damages arising from a violation of FDCPA are separate and distinct from the damages arising from the Georgia Debt Adjustment Act.

RICO, 18 U.S.C. § 1962(c), states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

The Jones claimants alleged the following against the defendants:

> Respondents' racketeering activities and frauds have been made, assisted and furthered by use of the United States mail and wires in violation of 18 U.S.C. § 1962, which frauds have consisted *inter alia* of the following: (a) representing that one or more Respondents provide tax-exempt, nonprofit, *bona fide* credit counseling; (b) representing or implying that DMP enrollment will substantially reduce debts and interest rates; (c) failing to evaluate DMP enrollments with fiduciary disinterestedness; (d) failing to adequately disclose or assess DMP costs, risks, complications, and alternatives; (e) failing to disclose financial relationships among Respondents; (f) advertising DMP services as "free" when Respondents impose mandatory costs and fees for the large majority of the Class; (g) failing to disclose that creditor Fair Share contributions vary directly with DMP enrollment levels; (i) failing to disclose that creditors refusing to offer rate reductions are

> "packaged" into DMPs, thereby boosting fees based on account size; and (j) filing tax returns with falsified information.

*Doc 100-4, pp. 58-9. ¶ 212.* Yet again, as with CROA and FDCPA, the <u>Jones</u> claimants have not sought redress for being overcharged debt adjustment fees in violation of OCGA § 18-5-1 *et seq.* but rather have sought damages arising from violations of federal RICO that separate and distinct from the damages arising from the Georgia Debt Adjustment Act.

MCPA, Maryland Code § 13-303, states

> A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in:
>
> 1. The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;
>
> 2. The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;
>
> 3. The extension of consumer credit; or
>
> 4. The collection of consumer debts.

<u>Id</u>. Finally, as with the three previously-discussed statutes, damages arising from a violation of MCPA are separate and distinct from the damages arising from the Georgia Debt Adjustment Act.

Thus as demonstrated, it is unlikely that an overlap of recovery will occur for the <u>Craft</u> class members with any recovery these same individuals might receive from the <u>Jones</u> arbitration. However, in the event that there are funds clearly identifiable as monies paid as debt adjustment fees by Georgia members of the <u>Jones</u> class, then all that would be required to eliminate a "double recovery" would be to credit said "debt adjustment fees" back to AFS and Amerix. In no event could the $5,000 statutory penalty of OCGA § 18-5-4 be received by any member of the <u>Jones</u> Arbitration, because a Georgia Debt Adjustment Act cause of action has not

been alleged in <u>Jones</u> and, further, certification of a similar cause of action was denied by the <u>Jones</u> arbitrator.

Defendant Amerix Corporation (Amerix) takes the position that this Court should take the <u>Jones</u> Arbitration "into consideration because its existence prevents a class in this case from being 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Doc 110, p. 1*. Amerix goes on to claim that if this Court approves the <u>Craft</u> class based on the Georgia Debt Adjustment Act, the existence of the <u>Jones</u> arbitration class creates a conflict because judicial estoppel would prevent the <u>Craft</u> class members from participating in both classes. It is the position of Amerix that judicial estoppel prevents the Georgia residents from advocating for protection under the Georgia Debt Adjustment Act in this case and at the same time make a claim through the <u>Jones</u> arbitration based on the application of the contractual choice of law provision. These arguments are unavailing.

First of all, enforcing the Maryland choice of law provision would be contrary to Georgia's public policy when to do so would infringe on the police powers of this state to protect its citizens. *See doc. 97-1, p. 15*. If Amerix's argument was extended to its conclusion, debt adjustment companies could avoid all state regulations by changing their choice of law provisions to the least restrictive state. Under Amerix's theory, the State of Georgia could not protect its citizens.

Secondly, Amerix's argument ignores the fact that the claims under the Georgia Debt Adjustment Act are statutory in nature and not contractual. As Plaintiff previously argued, the contractual arbitration and choice law provisions do not apply to the claims under the Georgia Georgia Adjustment Act because the Act claims arise from the statute and not the contract. Applying Georgia law for this case is a matter of public policy, or at the very least, is a non-

contractual statutory application, not limited by a contractual provision.  As a result, there is no conflict or inconsistency as Amerix attempts to promote.

Third, judicial estoppel is not applicable to the circumstances of this case.

> As we have explained, judicial estoppel "should be employed when a litigant is `playing fast and loose with the courts' and when ` intentional self-contradiction is being used as a means of obtaining unfair advantage'." Patriot Cinemas, 834 F.2d at 212 (quoting Scarano v. Central R.R., 203 F.2d 510, 513 (3d Cir.1953)); see also United States v. Levasseur, 846 F.2d 786, 792 (1st Cir.) (observing that the "primary concern of the doctrine of judicial estoppel is to protect the integrity of the judicial process"), cert. denied, 488 U.S. 894, 109 S.Ct. 232, 102 L.Ed.2d 222 (1988). By the same token, a fraud on the court requires that a litigant and his lawyer concoct some unconscionable scheme calculated to impair the court's ability fairly and impartially to adjudicate a dispute. See Aoude v. Mobil Oil Corp., 892 F.2d 1115 at 1118.

Sandstrom v. Chemlawn Corp., 904 F.2d 83, 87-88 (5th Cir. 1990)

> As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding.  See Pegram v. Herdrich, 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000); see also 18 James Wm. Moore et al., Moore's Federal Practice § 134.30, at 134-62.1 (3d ed.2003).  The doctrine is designed to ensure that parties proceed in a fair and aboveboard manner, without making improper use of the court system. New Hampshire v. Maine, 532 U.S. 742, 749-50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).  Consistent with that root purpose, the doctrine is flexible and not subject to mechanical rules for determining its applicability. Id. at 751, 121 S.Ct. 1808. Courts are prone to invoke it "when a litigant is playing fast and loose with the courts," and not otherwise. Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987) (citation and internal quotation marks omitted).

Intergen NV v. Grina, 344 F.3d 134, 144 (1st Cir. 2003)

Mrs. Craft (and her attorneys) was not the litigant and did not make the decisions or arguments presented in Jones.  Therefore it cannot be said that the Craft litigants are 'playing fast and loose with the courts' or that they engaged in 'intentional self-contradiction' 'as a means of

obtaining unfair advantage'. Plaintiff and her counsel did not find any case law applying judicial estoppel to class action claims brought by different class representatives for different causes of action with different counsel, nor have the defendants cited to any.

In addition, Amerix has stretched its feigned level of concern for the Georgia residents when it seeks to "help" them avoid having to select between two classes based on an alleged conflict. Amerix then goes on to admit, however, that even if this Court did not certify the Craft Litigation class, the Georgia residents would still have to choose between staying in the Jones class or opting out of the Jones class to pursue an individual claim under the Georgia Debt Adjustment Act and Georgia Fair Business Practices Act. Such Georgia residents would still have to seek individual counsel to make such a decision and they would still have to analyze which of the options would maximize their recovery. Amerix apparently believes it would be doing the Craft class a service by not giving them a third choice of certifying the Craft class under the Debt Adjustment Act. Fewer choices would certainly be better for Amerix, but not for the Craft putative class. In addition, the Georgia residents should be able to pursue claims under both classes because they are based on different legal causes of action which are not inconsistent or in conflict with each other. It should also be noted that there is no provision in the AAA rules for Craft to intervene so as to have the right to participate in the prosecution of the class action. Simply being allowed to be present at a hearing is not the same as being allowed to intervene. There is also no mechanism for Craft to assert the protection of the Georgia DAA so as to deter other Debt Adjusting companies from violating the Georgia DAA.

Regardless of the certification of the Jones class, certification of the Craft class remains the superior method by which Georgia residents can be protected from unlawful and unfair fees being imposed by the Debt Adjusters as occurred in this case.

Respectfully submitted, this the 19 day of November, 2009.

                    **LEWIS, STOLZ, HURT,**
                    **FRIERSON   & GRAYSON, LLP**

                      s/  James W. Hurt, Jr.
                    James W. Hurt, Jr.
                    Georgia Bar No.:  380104
                    Irwin W. Stolz, Jr.
                    Georgia Bar No.: 683700

The Camak House
279 Meigs Street
Athens, Georgia 30601
(706) 353-6585
Facsimile:  (706) 354-1785
jhurt@lewis-stolz.com

                    **CORY, WATSON, CROWDER,**
                    **& DEGARIS, P.C.**

                      s/  G. Rick DiGiorgio
                    George Richard DiGiorgio
                    Alabama Bar No.:     ASB-0289-R72G
                    F. Jerome Tapley
                    Alabama Bar No.: ASB-0583-A56T
                    Jon C. Conlin
                    Alabama Bar No.:     ASB-7024-J66C

*Pro Hac Vice*
2131 Magnolia Avenue
Birmingham, AL 35205
Telephone:  (20-5) 328-2200
Facsimile:  (205) 324-7896
rdigiorgio@cwcd.com
jtapley@cwcd.com
jconlin@cwcd.com                  **ATTORNEYS FOR PLAINTIFF**